# EXHIBIT C



Court File No.

CR 20-01-38356

# COURT OF QUEEN'S BENCH
## (WINNIPEG CENTRE)

IN THE MATTER OF AN APPLICATION PURSUANT TO SECTION 13 OF THE *EXTRADITION ACT* FOR A WARRANT FOR THE PROVISIONAL ARREST OF PETER NYGARD

B E T W E E N:

## THE ATTORNEY GENERAL OF CANADA
## ON BEHALF OF THE UNITED STATES OF AMERICA

Applicant

- and -

## PETER NYGARD

Respondent/Person Sought

---

## AFFIDAVIT OF STEFANE NICOLAS

---

**ATTORNEY GENERAL OF CANADA**
Department of Justice Canada
Prairie Region, Winnipeg Office
601-400 St. Mary Avenue
Winnipeg, Manitoba R3C 4K5
Fax:  (204) 984-6488

FILED
QUEEN'S BENCH
DEC 14 2020
LAW COURTS
WINNIPEG

**Per: Scott Farlinger/Brenna Dixon**
Telephone: (204) 983-2391
Scott.Farlinger@justice.gc.ca /Brenna.Dixon@justice.gc.ca
Counsel for the Attorney General of Canada

Court File No.

## COURT OF QUEEN'S BENCH
## (WINNIPEG CENTRE)

IN THE MATTER OF AN APPLICATION PURSUANT TO SECTION 13 OF THE *EXTRADITION ACT* FOR A WARRANT FOR THE PROVISIONAL ARREST OF PETER NYGARD

B E T W E E N:

### THE ATTORNEY GENERAL OF CANADA
### ON BEHALF OF THE UNITED STATES OF AMERICA

Applicant

- and -

### PETER NYGARD

Respondent/Person Sought

### AFFIDAVIT OF STEFANE NICOLAS

I, Stefane Nicolas, Peace Officer, of the City of Winnipeg, Manitoba, AFFIRM AND SAY AS FOLLOWS:

### I.        Overview

1.        I am a Sergeant with the Royal Canadian Mounted Police currently assigned to the Federal Serious and Organized Crime Unit in Winnipeg, Manitoba. As such, I have personal knowledge of the matters deposed to in

this Affidavit, except where stated to be based on information and belief, in which case I believe them to be true. In particular, I have received the information contained in this affidavit from information forwarded by authorities in the United States in support of their extradition request; from other law enforcement officers; and from the Department of Justice Canada, which information I believe to be true.

2.      I am aware that the Minister of Justice has issued an Authorization to Apply for a Provisional Arrest Warrant with respect to Peter Nygard ("NYGARD"), dated December 9, 2020. Attached as Exhibits A to E respectively are copies of materials that I have received from the Department of Justice Canada, and that I have reviewed:

> (a) a copy of the Authorization to Apply for a Provisional Arrest Warrant Issued on behalf of the Minister of Justice on December 9, 2020 (**Exhibit "A"**);

> (b) a copy of an arrest warrant issued by the United States District Court (Southern District of New York) on November 23, 2020, (**Exhibit "B"**);

(c) a copy of an undated colour photograph of NYGARD provided by authorities in the United States of America ("U.S.") (**Exhibit "C"**);

(d) the Request for Provisional Arrest to Canada related to NYGARD provided by the U.S. (**Exhibit "D"**);

(e) the Summary of Facts and Statement of Urgency related to NYGARD provided by the U.S. (**Exhibit "E"**).

3.      Pursuant to the Request for Provisional Arrest (the "Request") made by the Government of the United States of America to the Government of Canada, I affirm this Affidavit in support of an application for a warrant for the provisional arrest of NYGARD pursuant to the provisions of the *Extradition Act* and the *Treaty of Extradition between the Government of Canada and of the United States of America*.

4.      The Government of the United States of America seeks the provisional arrest of NYGARD for prosecution for the offences of racketeering conspiracy, sex trafficking conspiracy, sex trafficking, transportation of a minor for prostitution, and transportation for prostitution, contrary to Title 18 of the United States Code, sections 1962(d), 1594, 1591, 2423, and 2421.

5.       Pursuant to section 12 of the *Extradition Act*, the Minister of Justice has authorized the Attorney General of Canada to apply for a warrant for the provisional arrest of NYGARD (**Exhibit "A"** to this affidavit).

## II.      Facts of the Case

### U.S. Investigation

6.       Based on my reading of the particulars set out in the Request (**Exhibit "D"**), I believe the following to be true:

(a) The particulars of the person sought to be provisionally arrested are as follows:

| | |
|---|---|
| Name: | Peter Nygard |
| Date of Birth: | July 24, 1941 |
| Place of Birth: | Finland |
| Citizenship: | Canada, Finland |
| Height: | 177 cm |
| Weight: | 78 kg |
| Eye Colour: | Blue |
| Hair Colour: | Grey |
| Ethnicity/Race: | White |
| Address: | 750 John Bruce Road East |
| | Winnipeg, MB R3X 1Y2 |

(b) On November 23, 2020 an arrest warrant was issued by a Judge of the United States District Court for the Southern District of New York (**Exhibit "B"**) for the arrest of NYGARD.

7.      I have reviewed the Summary of Facts and Statement of Urgency (**Exhibit "E"**) and believe the facts summarized therein to be true. In particular, I believe the following facts with respect to the U.S. investigation into NYGARD and the offences under investigation:

Statement of Facts

(a)      NYGARD is the founder of an international clothing design, manufacturing, and supply business headquartered in Winnipeg, Canada, with multiple product lines and brands, many of which bear NYGARD's name;

(b)      U.S. authorities have been conducting a long-term investigation into NYGARD and co-conspirators, establishing a decades-long pattern of criminal activity in the United States, the Bahamas, and elsewhere.   The evidence gathered in the United States includes interviews of more than two dozen victims. The investigation shows that NYGARD's criminal conduct has affected hundreds of victims. The harm to his victims has included not only economic and psychological harm but also numerous instances of non-consensual

sex, including non-consensual group sex, attempted forcible rapes, and drugging of victims. While some victims have suffered only a single sexual assault by NYGARD, others have been subjected to persistent manipulation and sexual abuse;

(c)    The  investigation has determined that from about 1995 to the present NYGARD and multiple co-conspirators have used force, fraud, and coercion to recruit and entice female victims, both adults and girls ages 14 to 17, to engage in paid sex with NYGARD, and, on occasion, with NYGARD's business and personal associates. NYGARD and his co-conspirators also transported adults and girls ages 14 to 17 across state and international lines for purposes of paid sex and, in some instances, sexual assault;

(d)    NYGARD regularly used his corporate entities and resources to facilitate the commission of these offences, including by diverting corporate funds and using corporate employees for his own criminal purposes;

(e)    NYGARD's victims generally described a relationship with NYGARD in which they were paid for sex that was in turn induced

through force, fraud, and coercion. Many of the victims were referred to by NYGARD as "girlfriends", and some also functioned as quasi-personal assistants to NYGARD.

(f)     Multiple victims stated that they were initially induced into close contact with NYGARD in response to false promises that he made to them. For example, NYGARD made promises of modeling or fashion industry jobs that did not exist, or of assistance with their careers in other ways, and then sexually propositioned them as a condition of his assistance;

(g)     Many of the victims also described being repeatedly coerced into submitting to sex with NYGARD. The coercive measures NYGARD used included threats of economic harm (*e.g.*, termination of employment, career, and financial support), actual economic harm, false promises of opportunities for advancement (in exchange for sexual compliance), surveillance of the victims' movements, physical isolation, verbal abuse, instances of forced non-consensual sex, and other techniques of psychological control;

(g)   For example, victims have described travelling with NYGARD while being constantly surveilled and having little to no control over their ability to leave premises without NYGARD's permission, such as at his Bahamas estate. In addition, international travel arrangements were managed exclusively by corporate employees at NYGARD's direction, making it difficult, and in some cases impossible, for victims to return home without NYGARD's permission and financial assistance;

(h)   In addition, multiple victims were forced to engage in sex acts, whether by being drugged or forcibly assaulted;

(i)   Many victims described that in addition to demanding access to his "girlfriends" and "assistants" for sex, NYGARD regularly required access to new sexual partners, including both adults and girls ages 14 to 17.   NYGARD and his co-conspirators used various recruitment tools to identify new potential victims, including (1) dinners, poker games, and large parties at his properties called "Pamper Parties"; (2) long-term relationships with co-conspirators, and (3) the personal recruitment of the friends and acquaintances of his "girlfriends" and "assistants."

(j)     NYGARD also used victims already under his control as a commodity to trade for other sexual partners.   NYGARD would regularly patronize sex and swing clubs and, at these clubs, repeatedly forced and coerced "girlfriends" and "assistants" to engage in group sexual activity to which they did not consent;

(k)     Specific examples of victims include Minor Victim-1, Victim-2, Victim-3, Victim-4, Victim-5, and Victim-6, who described being repeatedly coerced into submitting to sex with NYGARD.

(l)     Minor Victim-1 was initially induced onto a NYGARD property by a NYGARD "girlfriend". NYGARD subsequently isolated Minor Victim-1 in his bedroom and had sex with her, knowing that she was under the age of 18.   Minor Victim-1 did not feel that she could leave the room or say no;

(l)     Minor Victim-1 subsequently travelled with NYGARD as a "girlfriend," being paid in cash to continue a sexual relationship. Without her permission, or even advance warning, NYGARD brought Minor Victim-1 to a swing club in New York, where he directed her to have sex with other men so that NYGARD could have sex with those

men's female partners.   Minor Victim-1, who had never travelled internationally before and was dependent on NYGARD for her travel arrangements and accommodations, felt compelled to submit to his demands;

(m)  Victim-2, Victim-3, and Victim-6 were among those who functioned as quasi-personal assistants to NYGARD. Each was initially induced into close contact with NYGARD in response to false promises that he made to them;

(n)  Victim-2 and Victim-6 have described instances at sex clubs where NYGARD attempted to, or directed other men to, sexually assault them without their consent. NYGARD directed other men to ejaculate on Victim-2 against her will at a club in the United States. NYGARD also attempted, with another man, to force Victim-6's legs apart to have sex after she refused, also at a club in the United States;

(o)  Victim-3 described an instance in 2018 when she was drugged and gang-raped by NYGARD and five other men while travelling internationally with NYGARD.  She recalled few details of the assault,

but NYGARD described it to her afterwards, angered that she had "ruined" the night by attempting to fight the men off and yelling;

(p)    Victim-4 was transported in a Company vehicle from New Jersey to New York, where NYGARD attempted to force Victim-4 to engage in sexual conduct, including by digitally penetrating her;

(q)    Victim-5 also described that after NYGARD made her a "girlfriend," he directed her to recruit new women and girls for sex with him, including girls under the age of 18.  She and other "girlfriends" often invited women and girls to NYGARD's properties or the hotels where NYGARD was staying, and then offered them alcoholic drinks and recreational drugs in advance of meeting NYGARD, in hopes that it would facilitate sexual contact.  Victim-5 and others described that for the duration of their years-long interactions with NYGARD, he required his so-called "girlfriends" to find new women and girls for him to have sex with on a near-daily basis.

(r)    Additional evidence of NYGARD's recruitment of women and girls for sex includes:

(i)    Email correspondence with corporate employees about Pamper Parties and other recruitment events, directing those employees as to physical requirements for female invitees and the implementation of "ratings" for prospective and past party guests;

(ii)    Employee emails about preparations for the events, which included ensuring that there was sufficient sexual lubricant and cash on hand for NYGARD;

(iii)    Email and phone correspondence with co-conspirators about women they referred to NYGARD for sex; travel arrangements for the women to see NYGARD; and payments for their services; and,

(iv)    Email and cellphone exchanges with "girlfriends," including Minor Victim-1, about prospective sexual partners, as well as communications with Company employees arranging travel for those individuals;

(s)    Evidence also shows that NYGARD exploited his companies to carry out and conceal his criminal conduct in various ways, including:

(i)    Using corporate staff and resources to organize, execute, and pay for victim recruitment events at his properties;

(ii)   Using company funds to pay victims and to cover various related expenses, including plastic surgery, abortions and medical treatments;

(iii)   arranging travel for NYGARD and victims;

(iv)   providing property management and security services at NYGARD's various properties, including by restricting victims' ability to leave the properties without NYGARD's express approval;

(v)   Transporting victims and NYGARD to sex and swing clubs; and,

(vi)   Using corporate employees and funds to quash negative publicity related to allegations of sexual assault and sex trafficking and to engage in illegal witness tampering.

(t)   This range of conduct by NYGARD's companies and corporate staff includes:

(i)   Maintaining records of NYGARD's Pamper Parties, including guest lists with notes about particular female guests, their body type and/or the body type of their friends, whether or

not they had gone up to NYGARD's bedroom, and what time they left the premises;

(ii)    Organizing, supplying, and executing these events, including screening and ranking attendees and stocking the property with sexual lubricant and alcohol, among other things;

(iii)    Maintaining travel records, including manifests and passport copies, related to the company-funded travel of adult victims, as well as victims under the age of 18.

(iv)    Receipt of NYGARD's email, via "girlfriends" or corporate employees, documenting his authorization of payments to victims;

(v)    Communicating with NYGARD's company email about security at his properties, including email correspondence with staff in California about women attempting to leave the property without permission and being stopped by staff members;

(vi)  Driving NYGARD and victims to sex and swing clubs; and,

(vii)   Assisting in restricting victims' ability to leave NYGARD's properties, including by utilizing physical barriers, lock pads, and security cameras;

Identification

(u)    NYGARD is a Canadian citizen with a date of birth of July 24,

1941.  NYGARD's Canadian passport number is AJ609577.  United

States Customs and Border Protection records show that NYGARD

travelled under this passport as recently as February 24, 2020, from

St. Paul International Airport in Minnesota to Winnipeg International

Airport in Canada.  The photograph attached as **Exhibit "C"** has been

identified as depicting NYGARD by numerous victims, including Victim-

2, Victim-3, Victim-5, and Victim-6.

Statement of Urgency

*Danger to community*

(v)    As described above, NYGARD has engaged in decades of sex

trafficking and related offenses facilitated by those in his employ.

In addition to conduct that took place in the United States, over the last

25 years and with the assistance of corporate employees, NYGARD

has also enticed women to travel to Canada for this purpose and

victimized them at properties in Winnipeg, Toronto, and Falcon Lake.

Some of the employees and confidantes who have facilitated such

conduct continue to work for and to assist NYGARD;

(w)   Some of NYGARD's victims have been subjected to persistent manipulation and sexual abuse. These longer-term victims are required to be constantly available to NYGARD and are not permitted to leave his property without his permission;

(x)   As recently as February 2020, NYGARD travelled into Canada with a female United States citizen, ostensibly working as his personal assistant ("Female-1").   Female-1 was with NYGARD until approximately October 2020, when she returned to the United States;

(y)   Upon her return to the United States, the FBI executed a search warrant for Female-1's cellphone.   Communications on Female-1's cellphone indicate that, while in Canada, she was required to reside with NYGARD; that she was worked by NYGARD to the point of exhaustion; that NYGARD closely monitored her movements; and that NYGARD explicitly instructed her that she was not permitted to leave the premises without his permission;

(z)   In addition, in the days leading up to Female-1's departure, she communicated with Victim-6, telling her, in sum and substance, that NYGARD had "been a monster" and that she was leaving;

*Obstruction of justice/witness tampering*

(aa)  During the past several decades, NYGARD has also repeatedly engaged in efforts to obstruct justice and tamper with potential witnesses against him.  These efforts have included paying witnesses to provide false information, monitoring contact between victims and U.S. law enforcement, and providing false information to witnesses, including those NYGARD knew had been contacted by U.S. law enforcement; Examples include:

(i)     In or about 2016, after learning about a federal criminal investigation, NYGARD directed Victim-6 to provide testimony establishing that Minor Victim-1 was an adult under U.S. law, that when she travelled with NYGARD.  Victim-6, who believed at the time that Minor Victim-1 was 18 or older, agreed, and offered sworn statements at what she understood to be a civil deposition. After NYGARD subsequently rewarded her with a $2,000 cash bonus, she later learned that Minor Victim-1 was under age 18;

(ii)    Messages recovered from NYGARD's phone demonstrate that in or about December of 2019, a witness who had been lawfully served by the FBI with a subpoena ("Female-2") sent NYGARD a photograph of the FBI agent's business card.  About 20 days later, NYGARD sent Female-2 another message falsely telling her that the agent was a "fake.";

(iii)     Another longtime "girlfriend" ("Female-3") advised Victim-3 that in the summer of 2020, after the U.S. investigation had been revealed, NYGARD contacted Female-3 from another person's phone to convey, in substance, that if she were not on his "side" then she was "going down.";

*Flight risk*

(bb)   NYGARD is aware of the U.S. investigation, as he was intercepted on February 24, 2020, in the St. Paul International Airport and served with a search warrant for electronic devices.   NYGARD subsequently boarded a flight to Canada;

(cc)   Soon afterward, a major retailer dropped NYGARD's clothing brand and several of NYGARD's corporate entities were put into bankruptcy proceedings in Canada and the United States.  While these proceedings have temporarily slowed NYGARD's ability to liquidate certain assets, he has maintained control over significant real property and bank accounts held by non-bankruptcy entities;

(dd)   Public real estate records, as well as filings in the Canadian bankruptcy proceeding, demonstrate that NYGARD has recently been liquidating some of these assets, including some in the United States,

and using Company employees to extract cash for his use. Moreover, the bankruptcy receivership is expected to end in or around January 2021, and NYGARD will then have easier access to additional corporate assets;

(ee)  Communications on Female-1's phone indicate that at least as recently as April 2020, NYGARD was considering travel to Malta or Bermuda, and that in or about June 2020, he was considering the logistics of travelling under an alias. Female-1's research on NYGARD's behalf is consistent with evidence that NYGARD does not undertake travel and other logistical arrangements personally, but delegates them to his staff, indicating that, in Female-1's absence, NYGARD would be inclined to turn to other employees for administrative tasks that could include arrangements to flee;

(ff)  In addition, communications between U.S. authorities and NYGARD's attorneys have made it clear that NYGARD is aware that U.S. authorities seized Female-1's phone in October 2020, a clear indication to him that the investigation is ongoing;

(gg) NYGARD also has a history of failure to appear in legal proceedings. As publicly reported, a warrant was issued for his arrest in the Bahamas after he failed to appear for a required court appearance related to ongoing civil litigation, and he was sentenced to 90 days in prison and a fine after a Bahamian court found that he violated a court order.[1] Emails and phone records reflect NYGARD's awareness of these legal proceedings; nonetheless, he has not returned to the Bahamas as directed. Moreover, NYGARD directed Victim-6 to help him feign an inability to travel because of medical problems, directing her, for instance, to photograph him at a hospital.

## RCMP investigation in support of Request

8.      In addition, in support of the Request, RCMP undertook a series of open-source searches and made other queries of publicly available databases with respect to NYGARD. I have reviewed this material, as well as media articles referred to me by the Department of Justice Canada, and learned the following:

---

[1] See generally https://globalnews.ca/news/4901221/arrest-warrant-issued-after-peter-nygard-fails-to-appear-in-bahamas-court/ and https://www.cbc.ca/news/canada/manitoba/peter-nygard-sentenced-jail-bahamas-1.5365500.

(a)   From media articles I reviewed, it has been reported that:

(i) NYGARD is extremely wealthy, and was previously listed as one of 100 wealthiest people in Canada. His net worth has been previously estimated to exceed $700 million;[2]

(ii)  NYGARD owns or a luxury estate in the Bahamas, which has been the subject of an ongoing legal dispute. Media articles report that NYGARD has ignored a 2013 issued by the Bahamian Courts; has been convicted of contempt of court on three occasions; failed to appear in court multiple times for sentencing in relation to these convictions; and ultimately had an arrest warrant issue for him in January, 2019.[3] The article also indicates that NYGARD did not pay over $3,000,000 in court costs until after the Court seized his estate;

(b)   I reviewed an affidavit affirmed by NYGARD on June 25, 2020 in his corporate bankruptcy proceedings in the Manitoba Court of Queen's Bench File No. CI 20-01-26627.[4]  NYGARD states that he was a permanent resident of the Bahamas for over 40 years. He also

---

[2] See, for example, https://www.canadianbusiness.com/lists-and-rankings/richest-people/five-people-who-fell-off-the-list-of-canadas-richest-people-this-year/
[3] See: https://nationalpost.com/news/world/court-in-bahamas-issues-arrest-warrant-for-canadian-fashion-mogul-peter-nygard
[4] The pleadings in this proceeding are available on the Receiver's website at: https://www.richter.ca/insolvencycase/nygard-group/

23

states that he has been a permanent resident of Canada in excess of one and one-half years;

(c)     From the same proceeding, I reviewed an affidavit affirmed by a Greg Fenske on June 24, 2020. Fenske states that he was a Director of Systems for the Nygard group of companies. He also states that NYGARD has been a permanent resident of Canada in excess of one and one-half years;

(d)     I also reviewed reports filed by the Receiver, Richter Advisory Group Inc. in that proceeding. A third supplementary report dated June 29, 2020 identifies:

(i)     a Steve Mager and a Jose Vasquez as being former Nygard employees who attended NYGARD's former apartment to retrieve his personal effects, and;

(ii)     that certain Nygard company vehicles had become registered in the names of certain Nygard Group executives or employees, including a Ford F150 XLT registered to Greg Fenske; a Dodge Ram 1500 Rebel Crew registered to Steve Mager; and a AM General Hummer H2 registered to Jose Vasquez;

(e)    I also reviewed a supplementary first report of the Receiver dated April 27, 2020, which noted an unusual amount of Nygard company computer file deletions that occurred on or about March 18, 2020, being the date that the Receiver was appointed. The report also notes that this occurred after a United States District Court Grand Jury subpoena was issued to Nygard Inc. on February 25, 2020, and after the Nygard Group's general counsel issued a legal hold notice to the Nygard Group on February 26, 2020. The report identifies one of the users involved in the deletion activity as "Nygard.com\GregFenskeGGF5140";

(f)    I reviewed the Manitoba Land Titles Registry Status of Title for 750 John Bruce Road East in Winnipeg, the address for NYGARD provided in the Request.  The Status of Title described the registered owner as 10059103 Manitoba Inc.; and,

(g)    I reviewed the Manitoba Companies Office registration for 10059103 Manitoba Inc., which listed its sole director as Gregory Fenske of 369 River Road, Winnipeg, Manitoba.

9.      As a result of the Request, the RCMP initiated surveillance of the residence at 750 John Bruce Road East ("Residence"), beginning on December 10, 2020. I participated in this surveillance, and have received regular updates from the surveillance teams involved, which now include teams from the Winnipeg Police Service in addition to RCMP. I have made the following observations, or I have been informed by these teams and believe they made the following observations:

(a)     Four vehicles were observed attending and leaving the Residence on December 10. These included a Hummer H2, Manitoba plate KLT650 registered to a Jose Vasquez, and a Dodge Ram, Manitoba plate BB7922 registered to a Steven Mager;

(b)     On the evening of December 10, a RCMP member observed the Residence's garage door open as a vehicle was leaving. The member observed large studio quality photographs of models in the garage, including one that appeared to be a photo of NYGARD. The member also observed a female of southeast Asian heritage, approximately in her mid-50's, leaving the garage in a Honda Odyssey and putting out garbage;

(c)    This female, or the Honda Odyssey, was also observed attending at the Residence on December 12, 13, and possibly December 11, at times with other vehicles;

(d)    On the afternoon of December 11, a female with grey/blonde hair walked from the Residence to check if the garbage cans on the Residence's driveway were emptied, and returned to the Residence. A female was also observed on the 2nd floor of the Residence at 9:40 p.m. that evening;

(e)    On December 11, four vehicles were also observed attending and  departing the Residence, including the Hummer H2 and Dodge Ram described above, as well as a GMC Yukon, Manitoba plate KLE976 registered to a Michael Charles Maxwell Reeve of 369 River Rd, Winnipeg;

(f)    On December 13, at 6:18 p.m., RCMP Cst. Stephane Theoret observed NYGARD looking out a basement window of the Residence. Cst. Theoret described the individual as a male, wearing a blue shirt and having white shoulder length hair. Cst. Theoret confirmed the

identity of NYGARD by comparison to the photo attached at **Exhibit "C"**.

(g)   Subsequently, at 8:17 p.m. on December 13, RCMP Sgt. Lance Goldau observed NYGARD through a basement window walking in the Residence and turning to face toward the street. Sgt. Goldau described the individual he observed "as his photo", and wearing a blue open collar shirt, with a tall forehead and long white hair;

(h)   Since the time of these sightings of NYGARD, RCMP have kept the Residence under continuous observation, with some assistance from the Winnipeg Police Service. I am advised by these surveillance teams and believe that, as of the execution of this affidavit, NYGARD has not been observed leaving the Residence in any of the vehicles subsequently observed there. He has also not been observed leaving the Residence by other means.

### III.      Grounds for Provisional Arrest Warrant

10.   I am advised by counsel at the Department of Justice Canada that the requirements for issuing a provisional arrest warrant are set out in section 13

of the *Extradition Act*, which requires an applicant to establish reasonable grounds to believe that:

> (a) it is necessary in the public interest to arrest the person, including the need to prevent the person from escaping or committing an offence;

> (b) the person sought is ordinarily resident in Canada, is in Canada, or is on the way to Canada; and,

> (c) a warrant for the arrest, or an order of a similar nature, has been issued for the person sought, or the person has been convicted.

## A.   It is necessary in the public interest to arrest NYGARD

11.   I believe it is in the public interest to arrest NYGARD at this time for the following reasons:

> (a)   As stated in the Summary of Facts and Statement of Urgency, NYGARD has demonstrated predatory behaviour over a period of decades, showing he presents a persistent danger to the community;

(b)   As indicated in the Statement of Urgency, I believe that as recently as October 2020, NYGARD has exercised psychological or physical control over Female-1, in a manner consistent with his pattern of control or coercion of victims. On this basis, I believe that NYGARD may have been continuing to commit the offences described as recently as October 2020, and may continue to do so;

(c)   In respect of NYGARD's ability to continue to commit offences, I would advise this Court that I have also received information from another agency suggesting NYGARD is presently in poor health. The information received is not specific, but indicates NYGARD takes a lot of medications, is an "old man" who isn't well, and can barely lift his arms above his head. Given this limited description, I do not know if NYGARD's health would prevent him from committing further offences, given the nature and range of offences described;

(d)   I believe NYGARD has demonstrated an ongoing intention to obstruct or defeat criminal investigations by the means described in the Statement of Urgency, including by interfering with or coercing witnesses;

(e)    I also believe that NYGARD continues to have corporate personnel available to him to assist in obstructing criminal investigations, as is suggested by the deletion of Nygard corporate data that was discovered by the Receiver;

(f)    For the reasons stated in the Statement of Urgency, I believe NYGARD presents a serious flight risk. NYGARD is aware of the U.S. investigation. NYGARD continues to possess substantial funds, notwithstanding his corporations' bankruptcies. NYGARD also has staff or "assistants" available to him to assist in making arrangements to flee, including, for example, by investigating travelling under an alibi;

(g)    I believe NYGARD also poses a substantial risk of flight or non-attendance in court based upon my own review of media articles, affidavits, and the Statement of Urgency. Based upon my review of these materials, I believe that NYGARD was a Bahamian resident for a significant period and owned a luxury property there, but left the country at the approximate time an arrest warrant issued for him. I believe that NYGARD has avoided returning to the Bahamas in order to avoid his arrest and serving the custodial sentence imposed there;

(h)     However, I am advised by counsel at the Department of Justice Canada that, according to a published judgment of the Bahamian Court of Appeal,[5] NYGARD has appealed his contempt sentence and, received a stay of execution the custodial sentence pending that appeal, having paid the fine component. I am also advised from that judgment that NYGARD is alleged, as of December 2019, to have multiple bench warrants that have issued for him in the Bahamas;

(i)     I am also aware, via the media articles I have reviewed, that NYGARD has alleged he missed the court date for which the January 2019 warrant issued due to illness. I have taken that into consideration, along with the U.S. information that he was feigning an inability to travel due to a medical condition;

(j)     Based upon the totality of the materials I have reviewed, though, I believe that NYGARD has demonstrated   a   pattern   of   non-attendance in court, and disregard for   court orders, that indicate a likelihood of continued non-attendance or flight;

---

[5] https://www.courtofappeal.org.bs/download/054086100.pdf

## B.    NYGARD is in Canada

12.    I believe NYGARD is ordinarily resident in Canada, based upon his citizenship; travel information provided by the U.S.; and his affidavit filed in the Nygard companies' bankruptcy proceeding. I believe he is presently in Canada based upon the surveillance observations of RCMP members on December 12, 2020 and subsequently. I believe he is residing at the Residence at 750 John Bruce Road East in Winnipeg, based upon the nature of its ownership; the identities of the visitors to the Residence; and the surveillance observations described above.

## C.    A warrant for arrest has been issued

13.    As noted above, a warrant for NYGARD's arrest was issued by the United States District Court for the Southern District of New York, and is attached at **Exhibit "B"**.

## Authorization to enter a dwelling house

14.    Based upon the surveillance observations of NYGARD described above, and the continuous surveillance of the Residence after that time, I have reasonable grounds to believe that NYGARD is present in the dwelling

house at 750 John Bruce Road East, and request authorization to enter the

Residence to execute the warrant requested.

15.   I affirm this affidavit in support of an application by the Attorney General

of Canada for a warrant for the provisional arrest of PETER NYGARD.

AFFIRMED before me at Winnipeg,                )
Manitoba, this 14th day of December,           )
2020.                                          )
                                               )
                                               )
_____               )
A Barrister and Solicitor entitled to                    STEFANE NICOLAS
practice in and for the Province of
Manitoba

This is Exhibit "A" referred to in the

Affidavit of <u>Stefane Nicolas</u>

affirmed before me this <u>14th</u>

day of <u>December</u>, 2020

A Barrister and Solicitor
in and for the Province of Manitoba

Form 1<br>
Section 12 - Authority to apply for a<br>
provisional arrest warrant

**TO: The Attorney General of Canada**

In the matter of an extradition request pursuant to the provisions of the *Extradition Act*, S.C. 1999, c.18

## COURT OF QUEEN'S BENCH OF MANITOBA

**BETWEEN:**

**THE ATTORNEY GENERAL OF CANADA**
**(on behalf of the United States of America)**

- and -

**PETER NYGARD**

## AUTHORIZATION TO APPLY
## FOR A PROVISIONAL ARREST WARRANT
### (Section 12 *Extradition Act*)

The United States of America has requested that Canada seek the provisional arrest of Peter Nygard.

The Attorney General of Canada is authorized to apply for a provisional arrest warrant.

DATED at Gatineau, Quebec, on the 9th day of December, 2020.


Marisa Ferraiuolo, Counsel
International Assistance Group
for the Minister of Justice of Canada

This is Exhibit "B" referred to in the

Affidavit of <u>Stefane Nicolas</u>

affirmed before me this 14th

day of <u>December</u>, 2020

A Barrister and Solicitor
in and for the Province of Manitoba

Mod AO 442 (09/13) Arrest Warrant    AUSA Name & Telno:

# UNITED STATES DISTRICT COURT

for the

## Southern District of New York

| | | | |
|---|---|---|---|
| United States of America | ) | | |
| v. | ) | Case No. | 20 Cr. 624 |
| PETER NYGARD | ) | | |
| | ) | | |
| | ) | | |
| | ) | | |
| *Defendant* | | | |

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*    PETER NYGARD                                                                ,
who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment        ☐ Superseding Indictment        ☐ Information        ☐ Superseding Information        ☐ Complaint
☐ Probation Violation Petition        ☐ Supervised Release Violation Petition        ☐ Violation Notice        ☐ Order of the Court

This offense is briefly described as follows:

Racketeering conspiracy (18 USC 1962(d)); sex trafficking conspiracy (18 USC 1594); sex trafficking (18 USC 1591); transportation of a minor for prostitution (18 USC 2423); transportation for prostitution (18 USC 2421)


Date:     11/23/2020

*Issuing officer's signature*

City and state:     White Plains, NY

Paul E Davison USMJ
*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ |
| Date: _____                                    *Arresting officer's signature* |
| *Printed name and title* |

This is Exhibit "C" referred to in the

Affidavit of <u>Stefane Nicolas</u>

affirmed before me this <u>14th</u>

day of <u>December</u>_____, 2020

A Barrister and Solicitor
in and for the Province of Manitoba

PROVISIONAL ARREST REQUEST FOR PETER NYGARD

Exhibit A



This is Exhibit "D" referred to in the

Affidavit of <u>Stefane Nicolas</u>

affirmed before me this <u>14th</u>

day of <u>December</u>, 2020

A Barrister and Solicitor
in and for the Province of Manitoba

## REQUEST FOR PROVISIONAL ARREST TO CANADA

RETURN COMPLETED FORM TO:

John Riesenberg
Associate Director
Office of International Affairs                    Phone:    (202) 514-0000
Criminal Division                                  Fax:      (202) 514-0080
U.S. Department of Justice

Jean Aylward
Trial Attorney
Office of International Affairs
Criminal Division
U.S. Department of Justice

**A.    IDENTIFICATION OF FUGITIVE:**

Name (include A/K/As):  _____Peter Nygard_____

Country(ies) of Citizenship:  ___Canada, Finland_____

Date(s) of Birth:  __July 24, 1941_____    Place of Birth: Helsinki, Finland____

Proof of Citizenship attached (if U.S. citizen): ____ (e.g., passport, naturalization or birth certif.)

Race: White_____        Gender: male  _X_____  female _____

Height:__177cm_____ Weight: 78KG_____ Hair Color:__gray_____Eye Color:__
blue_____

Scars/Other Characteristics:_____

Photograph Attached:__Y____ Fingerprints Attached:__N____

Driver's License No.:_____State issued: _____

Social Security No.:_____

Passport No.:__HC029230_____ Date & Place Issued:__March 19, 2015, Canada__

Nat'l ID Card No.:_____ Date & Place Issued: _____

Specific Address/Exact Location in Canada:_____    750 John Bruce Road East
                                                    Winnipeg, MB R3X 1Y2
                                                    Canada

Phone: 204-894-5000 / e-mail: Wpepe51@gmail.com

If in custody in Canada, Charges & Anticipated Date of Release: _____N/A_____

_____

Canadian law enforcement contact in Canada (NOT U.S. contact in Canada) with knowledge of facts, fugitive's location.   N/A

      Name & Title:_____
      Agency: _____
      Telephone:_____

Law enforcement contact in U.S. with knowledge of facts, fugitive's location:

      Name & Title:  Special Agent Rachel Graves_____
      Agency: _____Federal Bureau of Investigation, Squad C-20, Violent Crimes Against
      _____Children / Human Trafficking_____
      Telephone:    (212) 384-8558_____

**B.**　**CHARGES AND BASIS FOR REQUEST**

    **1.**　**U.S. Charging Or Commitment Document**

        Check One:　　　___X___　Indictment
                      _____　Superseding Indictment
                      _____Complaint
                      _____Judgment/conviction order
                      _____Other (DESCRIBE)

    Number: ____20 Cr. 624_____
    Date Filed: ___November 23, 2020_____
    Name and Location of Court: United States District Court Southern District of New York
                      500 Pearl Street_____
                      New York, NY 10007_____

Has the Charging Document been unsealed (or, been unsealed for the limited purpose of sharing the U.S. State Department and a foreign government for purposes of extradition)?

        YES _X___　　NO _____

    **2.**　**Minimum Sentence**

    Offenses for which extradition is requested are punishable by at least one year in prison:
    YES __X___　　NO _____

3.    <u>Statute of Limitations</u>

Does statute of limitations preclude prosecution or incarceration?
YES _____    NO __x__

4.    <u>U.S. Arrest Warrant</u> (attach copy)

Fugitive is wanted to (check one):    __x__    Stand Trial
                                     _____    Be Sentenced
                                     _____    Serve a Sentence
                                     _____    Serve Remaining Sentence (indicate how
                                     much left to serve)_____

Number:    20 Cr. 624
Date Filed:    November 23, 2020
Issued By:    U.S. Magistrate Judge Paul E. Davison
Name and Location of Court: United States District Court Southern District of New York
                                     300 Quarropas Street
                                     White Plains, New York 10601

5.    <u>Statements Supporting Provisional Arrest Request</u>

    *SEE ATTACHED STATEMENT of FACTS AND URGENCY*

C.    **REQUESTING AUTHORITY, AUTHORIZATION, AND FINANCIAL
      COMMITMENTS**

1.    <u>Requesting Authority</u>

Federal District    United States Attorney's Office for the Southern District of New York
or State/County    _____

2.    <u>Financial Information</u>

For **State/County** Request, letter agreeing to pay all extradition costs MUST BE
ATTACHED.    N/A
                    -----    **NOT APPLICABLE**    ---
Approving Financial Authority
Name:    _____
Billing Address:    _____
                    _____

Phone:    _____    Fax:    _____

3.    <u>**Prosecutor Authorization**</u>

Provide the name of the prosecutor authorizing this PA request:

Name:       <u>Celia Cohen / Jacqueline Kelly / Allison Nichols</u>
Title:        <u>Assistant United States Attorneys</u>
Address:    <u>1 St. Andrews Plaza, New York, NY 10007</u>
Phone:      <u>212-637-2466 / 2456 / 2366</u>
Email:       <u>Celia.Cohen@usdoj.gov / Jacqueline.Kelly@usdoj.gov</u>
                <u>Allison.Nichols@usdoj.gov</u>

This is Exhibit "E" referred to in the

Affidavit of <u>Stefane Nicolas</u>

affirmed before me this <u>14th</u>

day of <u>December</u>, 2020

A Barrister and Solicitor
in and for the Province of Manitoba

PROVISIONAL ARREST REQUEST FOR PETER NYGARD

## FACTS OF THE CASE

*Summary*

A long-term investigation by the United States Attorney's Office for the Southern District of New York and the Federal Bureau of Investigation ("FBI") has established that PETER NYGARD, age 79, and his co-conspirators have engaged in a decades-long pattern of criminal activity in the United States, the Bahamas, and elsewhere.

NYGARD is the founder of an international clothing design, manufacturing, and supply business headquartered in Winnipeg, Canada, with major offices and warehouses in Canada and in the United States (New York and California).  The fashion business has multiple product lines and brands, many of which bear NYGARD's name.  More broadly, NYGARD has a constellation of at least 40 different corporate entities organized in various countries, including Canada, the United States, the Bahamas, Barbados, and Hong Kong.  The finances and management of these companies are intermingled.  Banking records and emails obtained through U.S. legal process establish that, regardless of their formal ownership or management structure, many if not all of these companies are in fact operated by NYGARD and that NYGARD controls their finances.[1]  These documents further demonstrate that NYGARD and the corporate entities that he controls maintain numerous bank accounts, as well as valuable assets such a yachts and real property, in multiple countries.

Evidence gathered in the United States includes interviews of more than two dozen victims.  Based on those interviews and a review of other evidence, including emails from NYGARD's corporate email account received through U.S. legal process and evidence obtained from NYGARD's cellphone pursuant to a search warrant, the evidence demonstrated the following:

From at least in or about 1995 to the present, in the Southern District of New York and elsewhere, NYGARD and multiple co-conspirators, including numerous U.S.-based co-conspirators, used force, fraud, and coercion to recruit and entice female victims, both adults and girls ages 14 to 17, to engage in paid sex with NYGARD, and, on occasion, with NYGARD's business and personal associates.  NYGARD and his co-conspirators also frequently transported adults and girls ages 14 to 17 across state and international lines for purposes of paid sex and, in some instances, sexual assault.  To facilitate and fund his criminal conduct, NYGARD regularly exploited the privately held corporate entities he controlled (together, the "Company"), including by diverting Company funds and using Company employees for his own criminal purposes.[2]

---

1 Although certain of NYGARD's U.S. and Canadian entities were forced into bankruptcy by a major lender in February 2020, NYGARD has maintained control over other corporate entities with significant assets.

2 These entities include those based in the United States and elsewhere.  The finances and management of these entities are intermingled.  Regardless of their formal ownership or management structure, it is clear from the investigation that these entities are in fact operated by NYGARD.

PROVISIONAL ARREST REQUEST FOR PETER NYGARD

*Additional Facts*

As part of the investigation, numerous victims were interviewed, including Minor Victim-1, Victim-2, Victim-3, Victim-4, Victim-5, and Victim-6.   With the exception of Victim-4, each of these victims described a relationship with NYGARD in which they were paid for sex that was in turn induced through force, fraud, and coercion, as set forth in more detail below. Victim-4 was transported in a Company vehicle from New Jersey to New York, where NYGARD attempted to force Victim-4 to engage in sexual conduct, including by digitally penetrating her. Many of these and other similarly-situated victims were referred to by NYGARD as "girlfriends" and some of them, including Victim-2, Victim-3, Victim-6, also functioned as quasi-personal assistants to NYGARD.[3]

NYGARD and his co-conspirators used fraud, force, and coercion to induce victims to engage in sex acts.   We know from multiple victims, including Minor Victim-1, Victim-2, Victim-3, and Victim-5, that NYGARD frequently targeted women and girls who come from disadvantaged economic backgrounds and/or who have a history of abuse.   Multiple victims, including Victim-2, Victim-3, and Victim-6, stated that they were initially induced into close contact with NYGARD in response to false promises that he made to them.   For example, NYGARD made promises of modeling or fashion industry jobs that did not exist, or of assistance with their careers in other ways, and then sexually propositioned them as a condition of his assistance.

In addition, multiple victims were forced to engage in sex acts, whether by being drugged and/or forcibly assaulted.   For example, Victim-3 described an instance in 2018 when she was drugged and gang-raped by NYGARD and five other men while travelling internationally with NYGARD.   Victim-3 recalled few details of the assault, but NYGARD described it to her afterwards, angered that she had "ruined" the night by attempting to fight the men off and yelling.   Other victims, including Victim-2 and Victim-6, have described instances at sex clubs with NYGARD where he attempted to or directed other men to sexually assault Victim-2 and Victim-6 without their consent, including by directing other men to ejaculate on Victim-2 against her will at a club in the United States, and attempting with another man to force Victim-6's legs a part to have sex after Victim-6 refused, also at a club in the United States.

Many of the victims interviewed, including Minor Victim-1, Victim-2, Victim-3, Victim-4, Victim-5, and Victim-6, also described being repeatedly coerced into submitting to sex with NYGARD.   The coercive measures NYGARD used included threats of economic harm (*e.g.*, termination of employment, career, and financial support), actual economic harm, false promises of modeling opportunities and other career advancement –including fashion-related positions at the Company – in exchange for sexual compliance, surveillance of the victims' movements, physical isolation, verbal abuse, instances of forced non-consensual sex, and other techniques of psychological control.   For instance, these victims have each described travelling with NYGARD within the United States and internationally, staying with him at his various properties

---

[3]  Minor Victim-1, Victim-2, Victim-3, Victim-4, Victim-5, and Victim-6 all reside in the United States.

PROVISIONAL ARREST REQUEST FOR PETER NYGARD

and in hotels, and at all of these locations, being constantly surveilled and having little to no control over their ability to leave the premises without NYGARD's permission.   At some locations, the victims' ability to leave the property was exceptionally difficult.   For instance, at NYGARD's Bahamas estate, the property was secured by a large gate, controlled by NYGARD's employees at his sole discretion and security cameras monitored the gate.   In addition, when travelling internationally, the victims' travel arrangements, including flights and accommodations, were managed exclusively by Company employees at NYGARD's direction, making it difficult, and in some cases impossible, for victims to return home without NYGARD's permission and financial assistance.

Many victims – including the six described above – have described that in addition to demanding access to his "girlfriends" and "assistants" for sex, NYGARD regularly required access to new sexual partners, including both adults and girls ages 14 to 17.   NYGARD and his co-conspirators used various recruitment tools to identify new potential victims, including (1) dinners, poker games, and large parties at his properties called "Pamper Parties"; (2) long-term relationships with co-conspirators, including men who exploited women alongside NYGARD and in a similar manner, and at least one "madam"; and (3) the personal recruitment of the friends and acquaintances of his "girlfriends" and "assistants."   NYGARD also regularly patronized sex and swing clubs, including in New York, using victims already under his control as a commodity to trade for other sexual partners.   At these clubs, NYGARD repeatedly forced and coerced "girlfriends" and "assistants" to engage in group sexual activity to which they did not consent.

Multiple victims, including Minor Victim-1 and Victim-5 described that NYGARD sought both girls ages 14 to 17 and adult women for sex.   NYGARD had sex with Minor Victim-1 on numerous occasions while she was 17 and he was more than 50 years her senior. At the outset, NYGARD used a "girlfriend" to induce Minor Victim-1 onto a NYGARD property ostensibly to attend a Pamper Party.   NYGARD subsequently isolated Minor Victim-1 in his bedroom and has sex with her, knowing that she was under the age of 18.   Minor Victim-1 did not feel that she could leave the room or say no.   NYGARD then paid her cash. NYGARD subsequently had Minor Victim-1 travel with him as a "girlfriend," regularly paying her in cash to continue a sexual relationship.   Without her permission, or even advance warning, NYGARD brought Minor Victim-1 to a swing club in New York, where he directed her to have sex with other men so that NYGARD could have sex with those men's female partners.   Minor Victim-1, who had never travelled internationally before and was dependent on NYGARD for her travel arrangements and accommodations, felt compelled to submit to his demands.   She described not being scared of the other men, but rather, being scared of NYGARD.   Victim-5 described that after NYGARD made her a "girlfriend," he directed her to recruit new women and girls for sex with him, including girls under the age of 18.   Victim-5 recruited numerous women and girls for NYGARD, including girls she believed to be under the age of 18, in the United States and elsewhere.   Victim-5 described that she and other "girlfriends" often invited these women and girls back to NYGARD's properties or the hotels where NYGARD was staying, and then offered them alcoholic drinks and recreational drugs in advance of meeting NYGARD, in hopes that it would facilitate sexual contact.   Victim-5 and others described that for the duration of their

3

PROVISIONAL ARREST REQUEST FOR PETER NYGARD

years-long interactions with NYGARD, he required his so-called "girlfriends" to find new
women and girls for him to have sex with on a near-daily basis.

In addition to victim testimony, there are numerous emails and messages found in
NYGARD's Company email account and cellphone evidencing NYGARD's recruitment of
women and girls for sex.    For instance, from the 1990s to recently, NYGARD corresponded by
email with various Company employees about Pamper Parties and other recruitment events,
directing those employees as to the physical requirements for female invitees and the
implementation of "ratings" for prospective and past party guests.    NYGARD's employees also
emailed about preparations for the events, which included ensuring that there was sufficient
sexual lubricant and cash on hand for NYGARD.    In addition, NYGARD corresponded by
email and phone with co-conspirators about women they referred to him for sex, travel
arrangements for the women to see NYGARD, and payments for their services.    NYGARD's
use of "girlfriends" to recruit sexual partners is similarly reflected in his email and cellphone,
which contain numerous exchanges with "girlfriends," including Minor Victim-1, about
prospective sexual partners, as well as communications with Company employees arranging
travel for those individuals.

More generally, the evidence shows that NYGARD exploited his Company to carry out
and conceal his criminal conduct in various ways, including: (1) using Company staff and
resources to organize, execute, and pay for victim recruitment events at his properties; (2) using
Company funds to pay victims and to cover various related expenses, including plastic surgery,
abortions and medical treatments; (3) arranging travel for NYGARD and victims; (4) providing
property management and security services at NYGARD's various properties, including by
restricting victims' ability to leave the properties without NYGARD's express approval; (5)
transporting victims and NYGARD to sex and swing clubs; and (6) using Company employees
and funds to quash negative publicity related to allegations of sexual assault and sex trafficking
and to engage in illegal witness tampering.

NYGARD's email and phone, Company documents provided under U.S. legal process,
and corroborating victim statements, including from Victim-2, Victim-3, Victim-5, and Victim-6,
evidence this range of conduct.    For example, the Company maintained records of NYGARD's
Pamper Parties in California and in New York, including guest lists with notes about particular
female guests, their body type and/or the body type of their friends, whether or not they had gone
up to NYGARD's bedroom, and what time they left the premises.    Company staff was tasked
with organizing, supplying, and executing these events, including, for instance, screening and
ranking attendees and stocking the property with sexual lubricant and alcohol, among other
things.    The Company also maintained travel records, including manifests and passport copies,
related to the Company-funded travel of adult victims, as well as victims under the age of 18.
In at least one instance, these email records demonstrate that Company employees were in
possession of a victim's identity document establishing she was underage at the time of her
sexual relationship with NYGARD.    NYGARD's email with "girlfriends" and Company
employees documents his authorization of payments to victims.    NYGARD's Company email
also shows communications with Company employees about security at his properties, including

4

PROVISIONAL ARREST REQUEST FOR PETER NYGARD

email correspondence with staff in California about women attempting to leave the property without permission and being stopped by staff members.   Victim statements further corroborate this evidence, including how travel was arranged by Company employees at NYGARD's sole discretion and authorization; that NYGARD controlled their daily activities and access to leave or return to his properties; that Company employees drove NYGARD and victims to sex and swing clubs; and that NYGARD's employees assisted in restricting the victims' ability to leave NYGARD's properties, including by utilizing physical barriers, lock pads, and security cameras.

## IDENTIFICATION

PETER NYGARD is a 79 year-old Canadian citizen with a date of birth of July 24, 1941. NYGARD's Canadian passport number is AJ609577.   United States Customs and Border Protection records show that NYGARD travelled under this passport as recently as February 24, 2020, when he travelled from St. Paul International Airport in Minnesota to Winnipeg International Airport in Canada.   A photograph is attached hereto, which numerous victims, including Victim-2, Victim-3, Victim-5, and Victim-6, have identified as PETER NYGARD.

## BASIS FOR URGENCY

NYGARD's provisional arrest is requested on the basis of both risk of flight and dangerousness.

*First*, NYGARD presents a danger to the community.   As described above, NYGARD has engaged in decades of sex trafficking and related offenses facilitated by those in his employ. NYGARD used employees and "girlfriends," including trafficking victims, to recruit women and girls for commercial sex.   While much of that conduct occurred in the United States, over the last 25 years and with the assistance of employees of his Company, NYGARD has also enticed women to travel to Canada for this purpose and victimized them at properties in Winnipeg, Toronto, and Falcon Lake.   Some of the employees and confidantes who have facilitated such conduct continue to work for and to assist NYGARD.   The investigation, including through interviews with the victims detailed herein, shows that NYGARD's criminal conduct has affected hundreds of victims.   Harm to his victims has included not only economic and psychological harm but also numerous instances of non-consensual sex, including non-consensual group sex, attempted forcible rapes, and drugging of victims.   While some victims have suffered only a single sexual assault by NYGARD, others have been subjected to persistent manipulation and sexual abuse.   These longer-term victims are required to be constantly available to NYGARD and are not permitted to leave his property without his permission.   As recently as February 2020, NYGARD travelled into Canada with a female United States citizen, ostensibly working as his personal assistant ("Female-1").   Female-1 was with NYGARD until approximately October 2020, when she returned to the United States.   Upon her return to the United States, the FBI executed a search warrant for Female-1's cellphone.   Communications on Female-1's cellphone indicate that, while in Canada, she was required to reside with NYGARD; that she was worked by NYGARD to the point of exhaustion; that NYGARD closely monitored her movements; and that NYGARD explicitly instructed her that she was not

5

PROVISIONAL ARREST REQUEST FOR PETER NYGARD

permitted to leave the premises without his permission.   In the days leading up to Female-1's departure, she communicated with Victim-6, telling her, in sum and substance, that NYGARD had "been a monster" and that she was leaving.   This recent conduct, together with his decades-long course of conduct, demonstrate that NYGARD presents a persistent danger to the community.

Moreover, during the past several decades, NYGARD has repeatedly engaged in efforts to obstruct justice and tamper with potential witnesses against him.   These efforts have included paying witnesses to provide information that NYGARD knew to be false, monitoring contact between victims and U.S. law enforcement, and providing false information to witnesses, including those NYGARD knew had been contacted by U.S. law enforcement.   For instance, in or about 2016, after learning about a federal criminal investigation in the United States into trafficking activity, NYGARD directed Victim-6 to provide testimony establishing that Minor Victim-1 was an adult under U.S. law, that is, over age 18, when she travelled with NYGARD. Victim-6, who believed at the time that Minor Victim-1 was 18 or older, agreed, and offered sworn statements at what she understood to be a civil deposition.   After NYGARD subsequently rewarded her with a $2,000 cash bonus, she began to doubt the veracity of her statements and later learned that Minor Victim-1 was under age 18.   Messages recovered from NYGARD's phone demonstrate that in or about December of 2019, a witness who had been lawfully served by the FBI with a subpoena ("Female-2") sent NYGARD a photograph of the FBI agent's business card.  NYGARD indicated he would make inquiries about the agent and about 20 days later, he sent Female-2 another message falsely telling her that the agent was a "fake." Victim-3 has also spoken to another longtime "girlfriend" ("Female-3") who told Victim-3 that in the summer of 2020, after the U.S. investigation had been revealed, NYGARD contacted Female-3 from another person's phone to convey, in substance, that if she were not on his "side" then she was "going down."   These efforts threaten not only the prosecution of NYGARD, but the ongoing investigation of his co-conspirators.

*Second*, NYGARD presents a substantial risk of flight.   NYGARD was alerted to the U.S. investigation when he was intercepted on or about February 24, 2020, in the St. Paul International Airport and served with a search warrant for electronic devices.   NYGARD subsequently boarded a flight to Canada.   As previously noted, soon afterward, a major retailer dropped NYGARD's clothing brand and several of NYGARD's corporate entities were put into bankruptcy proceedings in Canada and the United States.   While these proceedings have temporarily slowed NYGARD's ability to liquidate certain assets, he has maintained control over significant real property and bank accounts held by non-bankruptcy entities.   Public real estate records, as well as filings in the Canadian bankruptcy proceeding, demonstrate that NYGARD has recently been liquidating some of these assets, including some in the United States, and using Company employees to extract cash for his use.   Moreover, the bankruptcy receivership is expected to end in or around January 2021, and NYGARD will then have easier access to additional corporate assets.   NYGARD is aware of the federal investigation and is no doubt aware of the substantial penalties potentially involved.   For these reasons, NYGARD has a significant incentive and means to flee.   Indeed, communications on Female-1's phone indicate that at least as recently as April 2020, NYGARD was considering travel to Malta or Bermuda,

6

PROVISIONAL ARREST REQUEST FOR PETER NYGARD

and that in or about June 2020, he was considering the logistics of travelling under an alias. The fact that Female-1 undertook such research on NYGARD's behalf is consistent with evidence provided by multiple victims and confirmed by email review that NYGARD does not undertake travel and other logistical arrangements personally, but delegates them to his staff, indicating that, in Female-1's absence, NYGARD would be inclined to turn to other employees for administrative tasks that could include arrangements to flee.   Moreover, communications between U.S. authorities and NYGARD's attorneys have made it clear that NYGARD is aware that U.S. authorities seized Female-1's phone in October 2020, a clear indication to him that the investigation is ongoing.

NYGARD has a history of failure to appear in legal proceedings.   As publicly reported, a warrant was issued for his arrest in the Bahamas after he failed to appear for a required court appearance related to ongoing civil litigation, and he was sentenced to 90 days in prison and a fine after a Bahamian court found that he violated a court order.[4]   Emails and phone records reflect NYGARD's awareness of these legal proceedings; nonetheless, he has not returned to the Bahamas as directed.   Moreover, NYGARD directed Victim-6 to help him feign an inability to travel because of medical problems, directing her, for instance, to photograph him at a hospital.

## COMMITMENT TO SEEK EXTRADITION

The United States commits that a request for extradition will be submitted to Canada within sixty (60) days of the date of provisional arrest.

---

4 *See generally* https://globalnews.ca/news/4901221/arrest-warrant-issued-after-peter-nygard-fails-to-appear-in-bahamas-court/ and https://www.cbc.ca/news/canada/manitoba/peter-nygard-sentenced-jail-bahamas-1.5365500.

7

### PROVISIONAL ARREST REQUEST FOR PETER NYGARD

Exhibit A

